**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| NATURAL LAND INSTITUTE, ) | |
| ) | Case No. 3:21-cv-50410 |
| *Plaintiff,* ) | |
| v. ) | Judge Iain D. Johnston |
| ) | |
| THE GREATER ROCKFORD AIRPORT AUTHORITY, ) | Magistrate Margaret J. Schneider |
| et. al. ) | |
| ) | |
| *Defendants.* ) | |

<u>**DEFENDANT GREATER ROCKFORD AIRPORT AUTHORITY'S MEMORANDUM**</u>
<u>**IN SUPPORT OF RULE 12(b)(1) MOTION TO DISMISS FOR LACK OF STANDING**</u>

NOW COME Defendants, THE GREATER ROCKFORD AIRPORT AUTHORITY, THE

GREATER ROCKFORD AIRPORT AUTHORITY BOARD OF COMMISSIONERS,[1] and

MICHAEL P. DUNN, EXECUTIVE DIRECTOR OF THE GREATER ROCKFORD AIRPORT

AUTHORITY, by and through their undersigned attorneys, and for their Memorandum in Support

of their Motion to Dismiss Plaintiff's Complaint for lack of standing pursuant to Rule 12(b)(1) of

the Federal Rules of Civil Procedure, state as follows:

## I.    INTRODUCTION

Natural Land Institute's ("NLI") Complaint seeks declaratory and injunctive relief to

prevent scheduled roadwork and an expansion of a Midfield Cargo Development on the grounds

of the Chicago Rockford International Airport owned and operated by the Greater Rockford

Airport Authority, alleging that the development would violate environmental regulations and

harm its members' alleged aesthetic and recreational interests in the Bell Bowl Prairie (the

"Prairie") located on the grounds of the airport. NLI, however, does not have standing to bring its

---

[1] The Greater Rockford Airport Authority Board of Commissioners is not a legal entity and should not be a party in this action.

claims against the moving Defendants as it fails to adequately allege that its members would be injured by the expansion in the area and evidentiary matters demonstrate NLI and its members have no rights or interests with respect to the Prairie. Therefore, Plaintiff fails to establish standing, as required under Article III of the U.S. Constitution, and its Complaint should be dismissed.

## II.    BACKGROUND

The land that is the subject of this action, including the land encompassing the subject Prairie, is owned by the Greater Rockford Airport Authority ("GRAA"), and located in Winnebago County, Illinois, approximately five miles south of the City of Rockford's central business district. Plaintiff challenges GRAA's proposed expansion of its cargo operation due to the alleged impact the construction would have on the Prairie, a remnant dry gravel hill, located on the grounds of the Chicago Rockford International Airport ("RFD"). RFD is owned and operated by GRAA.

GRAA was formed in 1946, under the Illinois Airport Authorities Act (the "Act"), 70 ILCS 5/0.01. The lands RFD presently sits on were deeded to GRAA on August 11, 1948, in fee simple absolute, by the United States of America. *See* Exhibit 1 to the Declaration of Zack Oakley ("Oakley Declaration"), attached hereto and incorporated herein as **Exhibit A**.

To meet existing needs, as well as accommodate the growth in its cargo operations, GRAA proposed a $50 million dollar plan to construct additional air cargo facilities on its grounds. The forty-year development plan for the airport, already settled after public hearings and required approvals, first envisioned development of the real estate located on the north side of the Runway. That area is now full. The remaining acreage for development is the Midfield, located on the south side of the Runway. The area of the Midfield Air Cargo Development is approximately 280 acres in size and contains primarily agricultural land, open fallow fields, airfield infrastructure, and the Prairie. Prior to commencing construction, GRAA pursued all required regulatory approvals,

2

including evaluation of the environmental impacts of the project. Regulatory bodies evaluating the plans included the Federal Aviation Administration, the United States Department of the Interior, the Illinois Department of Natural Resources, and the Illinois Department of Transportation.

On November 25, 2019, the FAA issued a Finding of No Significant Impact in relation to the planned expansion of RFD by GRAA, stating:

> After careful and thorough consideration of the facts contained herein, the undersigned finds that the proposed FAA actions are consistent with existing national environmental policies and objectives as set forth in Section 101(a) of the National Environmental Policy Act of 1969 (NEOA) and will not significantly affect the quality of the human environment or otherwise include any condition requiring consultation pursuant to Section 102(2)(c) of NEPA. Having met all relevant requirements for environmental considerations and consultation, the proposed development/actions are authorized to be undertaken.

*See* Pl.'s Mem. in Supp. of Mot. for T.R.O., Ex. I, p. 2.

In August 2021, a single foraging Rusty Patched Bumble Bee was allegedly found on or about the land constituting the Prairie. The Rusty Patched Bumble Bee was designated as an endangered species under the Endangered Species Act in 2017. *See* Endangered Species Status for the Rusty Patched Bumble Bee, Proposed Rule, 81 Fed. Reg. 65,324, 65,325 (Sep. 22, 2016); Final Rule, 82 Fed. Reg. 3,186 (Jan. 11, 2017). However, federal regulations do not require the designation of a critical habitat for this species because the "threatened destruction, modification, or curtailment of habitat is not the primary threat to the species, and the availability of habitat does not limit the conservation of the rusty patched bumble bee now, nor will it in the future." Endangered and Threatened Wildlife and Plants; Endangered Species Status for Rusty Patched Bumble Bee, 85 Fed. Reg. 54,281 (Jan. 11, 2017).

On October 26, 2021, Plaintiff filed its Complaint for Declaratory and Injunctive Relief, and on October 27, 2021, it filed a Motion for Temporary Restraining Order and/or Preliminary Injunction, seeking to halt the construction. On October 28, 2021, GRAA paused its plans for

construction until Federal Aviation Administration (FAA) consultation activities regarding the Prairie with the US Fish & Wildlife Service (USFWS) are concluded.

### III.   LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the existence of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). The party invoking federal jurisdiction bears the burden of establishing that subject matter jurisdiction is proper. *See Remijas v. Neiman Marcus Grp., LLC,* 794 F.3d 688, 691 (7th Cir. 2015). The plaintiff must have standing in order for the court to have subject matter jurisdiction to adjudicate the claims before it. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992) (hereinafter "*Lujan II*").

To evaluate a challenge to subject matter jurisdiction, the court must first determine whether a factual or facial challenge has been raised. *Apex Dig., Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 433 (7th Cir. 2009). A factual challenge contends, "there is in fact no subject matter jurisdiction," even if the pleadings are formally sufficient. *Id.* at 444. In reviewing a factual challenge, the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists. *Id.* In contrast, a facial challenge argues that the plaintiff has not sufficiently "*alleged* a basis of subject matter jurisdiction." *Id.* at 443. In the present matter, GRAA and Michael P. Dunn, Executive Director of the Greater Rockford Airport Authority (collectively the "GRAA Defendants"), make a factual challenge to subject matter jurisdiction.

### IV.   ARGUMENT

Federal district courts maintain "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Article III of the United States Constitution defines the proper scope of the federal court jurisdiction, or standing, as limited to adjudicating "cases" and "controversies." *Lujan II,* 504 U.S. at 559–60. To establish Article III

standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–181 (2000) (citing *Lujan II,* 504 U.S. at 560–61). As the party invoking federal jurisdiction, a plaintiff bears the burden of establishing the elements of Article III standing. *Lujan II,* 504 U.S. at 561.

Organizations do not have standing as such to represent their particular concept of the public interest, but organizations have been permitted to assert the rights of their members. Organizational standing allows an organization to sue on behalf of its members "even without a showing of injury to the association itself." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996). To sue on behalf of its members via organizational standing, an organization must show: (1) at least one of its members would "have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343 (1977); *Sierra Club,* 546 F.3d at 924. Without individual affidavits of the members, a court cannot assure itself that an organization's members use the area affected by the challenged activity or will be burdened by the challenged activity. *Summers v. Earth Island Institute,* 555 U.S. 488, 499 (2009). As such, an organization is required to identify members who have suffered the requisite injury. *Id.*

In the present case, NLI has failed to adequately show, by a preponderance of the evidence, that NLI or its members have standing under Article III. As such, NLI's Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

A.    **NLI AND ITS MEMBERS CANNOT ESTABLISH AN INJURY IN FACT AS NEITHER NLI OR ITS MEMBERS HAVE ANY RIGHT TO VISIT, USE, OR ENJOY THE SUBJECT LANDS**

NLI is unable to establish an injury in fact to its own or its members' legally protected interests because NLI and its members have no right to use, enjoy, or visit the lands affected by the planned development. As NLI cannot establish standing for itself or its members, the Complaint should be dismissed for lack of subject matter jurisdiction.

In its pleadings, NLI asserts that the organization was given custody and responsibility to manage the Bell Bowl Prairie, by GRAA, as part of a Master Plan and Resolution passed on November 1, 1977. *See* Pl.'s Compl., ¶ 64; Pl.'s Mem. in Supp. of Mot. for T.R.O., Ex. F, App. 11. However, this contention is without a basis. There is no record that GRAA ever reviewed or approved the document. The Resolution is not signed by either GRAA or NLI and does not form the basis of an agreement. Nothing in the cited Resolution transfers any sort of interest in the land to NLI. In fact, the Resolution expressly provides, "the Greater Rockford Airport Authority shall make every effort possible to preserve as a nature preserve the area outlined in red on the map attached to this Resolution so long as the preservation of the same as a nature preserve shall not interfere with the necessary operation of Airport." Pl.'s Mem. in Supp. of Mot. for T.R.O., Ex. F, App. 11. GRAA has never been provided a copy of the map referred to in the Resolution, nor does GRAA have any record that the Resolution was approved by the Board of Commissioners on November 1, 1977, or any other date.

The issue whether the resolution was ever passed is moot, however, because at its December 15, 2021 board meeting, the GRAA Board of Commissioners made and acted on a Resolution that provides that the purported Resolution dated November 1, 1977, if it was ever passed by the Board of Commissioners, is hereby repealed, and held for naught. Moreover, on November 8, 2021, GRAA sent a letter to NLI stating, "[t]he Authority is not aware of any written

6

agreement between Natural Land Institute and the Authority. However, if any such agreement does exist, notice is hereby given that any such contract or agreement is terminated effective immediately." *See* Exhibit 2 to the Oakley Declaration (Ex. A), Letter from Paul R. Cicero, Chairman of the Board of Commissioners of GRAA to Kerry Leigh, Executive Director, Natural Land Institute, dated Nov. 8, 2021. Therefore, even if the alleged November 1, 1977 resolution was ever approved by the GRAA Board of Commissioners, or if there ever was an agreement between GRAA and NLI, the resolution was effectively repealed and rescinded pursuant to Resolutions 20-71 passed by the GRAA Board of Commissions on December 15, 2021 and any agreement has been terminated. *See* Exs. 2 and 4 to the Oakley Declaration (Ex. A).

The facts and circumstances of this case show that NLI does not and cannot possibly satisfy the first element of standing, that NLI or its members suffered an injury in fact. To satisfy this element, a plaintiff must have suffered an injury of a legally protected interest which is both (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Lujan II*, 504 U.S. 555 at 560. The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 187, 181 (2000). NLI cannot demonstrate that NLI or its members have suffered a concrete and particularized injury which is actual or imminent and not conjectural or hypothetical, and thus cannot establish standing.

The subject land at issue in this case is privately-owned land which is inaccessible to the public. As set forth in the Oakley Declaration (Ex. A), the subject land is owned by GRAA. The subject land was dedicated by the federal government to GRAA to be used for the operation of the

business of GRAA including ownership and operation of the RFD airport. *See* Ex. 1 to the Oakley

Declaration. The deed transferring the property to GRAA provides, in relevant part,

> "[n]o property transferred by this instrument shall be used, leased, sold, salvaged or disposed of by the [Authority] for other than airport purposes without the written consent of the Civil Aeronautics Administrator, which shall be granted only if said Administrator determines that the property can be used, leased, sold, salvaged or disposed of for other than airport purposes without materially and adversely affecting the development, improvement, operation or maintenance of the airport . . . ."

A copy of the deed is Exhibit 1 to the Oakley Declaration (Ex. A). The land at issue is owned by

GRAA, and as determined by GRAA, is not accessible to the public. The subject land is located

between two existing runways of RFD and essentially surrounded by the airport. Pl.'s Mem. in

Supp. of Mot. for T.R.O., Ex. H. As the owner of the property, the GRAA is the only party that

has the authority and right to allow persons onto the subject lands. The public, including NLI and

its members, simply have no right to use, enjoy, or visit the subject land. GRAA has fenced in the

subject lands, posted no trespassing signs, and has informed NLI that its members and agents are

not allowed on the subject property. *See* Oakley Declaration (Ex. A), at ¶¶ 4–6. Since NLI has no

right to be on the property, they cannot possibly establish the development will lessen their recreational or

aesthetic use of the property. Unlike a public park, NLI and its members simply have no right to use or

enjoy the property and will not have such right or ability in the future.

Although NLI alleges that the Prairie is "publicly owned," this conclusory allegation and

phraseology is misleading. *See* Pl.'s Compl., ¶ 63. The fact that the land on which the RFD airport

is situated is owned by a public entity, GRAA, does not mean that the property is open to the

public. *See, e.g., U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129

(1981); *Greer v. Spock,* 424 U.S. 828, 836 (1976) ("[t]he State, no less than a private owner of

property, has power to preserve the property under its control for the use to which it is lawfully

dedicated."). It is common sense that, unlike a public park, airports are not freely open to the public

and that public access to most areas, other than clearly designated spaces, such as passenger terminals, is restricted. As the owner of the subject property, GRAA has, at least, the same rights as a private owner of property to exclude persons from the property and restrict the use of the property for its own purposes. *See Int'l Soc'y For Krishna Consciousness v. Lee,* 505 U.S. 672, 679 (1992) ("Where the government is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."). NLI has no right to use or enjoy the property and cannot prove an injury caused by the inability to use or enjoy property owned by a third party.

NLI attempts to support its own standing by alleging that GRAA allowed NLI, as well as others, to have some limited access to the Prairie in the past. Such discretionary access to the property does not support its assertion of standing in this case. Any access to the Prairie previously allowed to NLI or its members was subject to the discretion of GRAA. GRAA has exclusive authority, as the owner of the property, whether to allow *any* access to the property. While NLI vaguely asserts it has an agreement with GRAA to access the lands, there is no agreement, written or otherwise, entitling NLI, or its members, to freely access the lands without GRAA's consent. NLI relies on unsigned documents to allege there is an agreement between NLI and GRAA, but even those unsigned documents show that any access previously allowed to NLI was subject to GRAA's discretion and right of termination. The issue of an agreement is moot, however, because GRAA provided notice to NLI on November 8, 2021, that any such agreement, if any even existed or remained effective, was terminated. *See* Exhibit 3 to the Oakley Declaration (Ex. A) (attaching a copy of the termination notice). NLI has also been informed, via legal counsel, that NLI and its members are not allowed on the property. *See* Exhibit 2 to the Oakley Declaration (Ex. A). As

such, NLI cannot possibly demonstrate that NLI or its members will suffer a concrete, particularized injury by the development of the subject lands which they are not allowed, and have no right, to visit, use, or enjoy now or any time in the future.

Because the land at issue in the present matter is private and inaccessible to the public including NLI and its members, and because any agreement between NLI and GRAA has been terminated and any related resolution has been repealed, NLI and its members have no right to visit, use, or enjoy the subject property. As such, NLI and its members have suffered no injury in fact by the development of land which they have no right to visit, use, or enjoy. Therefore, NLI's asserted injury is conjectural and hypothetical, not concrete and particularized, and thus its members cannot establish the requisite injury in fact to support standing.

**B.** **THE DECLARATIONS OF NLI'S MEMBERS DO NOT ESTABLISH THAT THE MEMBERS HAVE SUFFERED AN ACTUAL OR THREATENED INJURY IN FACT**

Even if NLI or its members could establish a right to go on the subject lands, the declarations of NLI's members fail to establish an injury in fact suffered by them. In support of its purported associational standing, NLI attaches to its Complaint declarations of three of its members, John White, Zachary Grycan, and Jennifer Kuroda. None of the declarants' averments, however, establish a concrete, particularized injury, to their interests, resulting from GRAA's proposed development of RFD. As NLI cannot demonstrate associational standing without showing at least one of its members has suffered an injury in fact, NLI cannot possibly satisfy the requirements to sue on behalf of its members.

Plaintiff's first declarant, John White, is a plant ecologist and nature preservationist living in Urbana, Illinois, and just set foot on the land "last month." Pl.'s Compl., Ex. A, ¶ 25. Mr. White's averments do not establish standing for himself individually or for NLI. *See Lujan II,* 504 U.S. at 565–66 ("[P]laintiffs claiming injury from environmental damage must use the area affected by

10

the challenged activity."). Mr. White does not have concrete plans to visit the site again, as he states, "[i]f I can expand my research to include a dry prairie in northern Illinois, I would choose Bell Bowl Prairie as my study site." Pl.'s Compl, Ex. A, ¶ 37. As Mr. White does not aver that he visits or uses the affected area, other than one prior visit, and as he does not declare any plans to visit, use, or enjoy the subject property in the future (and could not possibly do so as he has no right to go on the land as set forth above), his declaration fails to establish a concrete, particularized injury. Moreover, "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved.' " *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972). As such, Plaintiff has failed to establish that Mr. White has standing in his own right, and thus NLI cannot invoke associational standing for this member.

Plaintiff's second declarant, Zachary Grycan, is the Director of Stewardship of NLI and has worked for NLI since 2015. Mr. Grycan's declaration provides that he accompanied a group "late this summer to survey the prairie and enjoy its beauty." Pl.'s Compl., Ex. B, p. 3. He also "personally participated in the removal of invasive species at Bell Bowl Prairie," and "photographed the Rusty Patched Bumble Bee." Pl.'s Compl., Ex. B, pp. 4–5. It is unclear from the declaration when these visits took place, how frequently they occurred, and whether Mr. Grycan was acting as an agent or employee for NLI during the visits. Such missing facts cannot simply be assumed by the court. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 889 (1990) ("it will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege"). Simply stating that the individual members of a group live, study work, and recreate near a location is insufficient to establish standing. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC,* 2 F.4th 1002 (7th Cir. 2021); *see also Summers,* 555

U.S. at 495 (finding that affidavit did not establish constitutional standing for organization because member's testimony was too generalized and did not identify imminent injury at a particular site). The declaration of Mr. Grycan does not establish that he regularly visits, uses, and enjoys the subject property or that he plans to in the future. He simply states that he is "holding out hope that . . . Natural Land Institute will be allowed to manage the prairie." Pl.'s Compl, Ex. B, p. 7. Even if Mr. Grycan had future plans to return to the Prairie, he has no right to go on the lands as set forth above. As such, the declaration of Mr. Grycan also fails to establish standing in his own right.

Plaintiff's third declarant, Jennifer Kuroda, is the president of the board for the Sinnissippi Audubon Society. Ms. Kuroda lives eleven miles from the Prairie and has "walked, photographed, and birdwatched at the Bell Bowl Prairie, as well as participated in bird counts over the years." Pl.'s Compl., Ex. C, ¶¶ 3–4. Specifically, in the fall of 2020 she "went to Bell Bowl Prairie with a local falconer to observe several American Kestrels." Pl.'s Compl., Ex. C, ¶ 8. She also states she visited the area on "September 17, 2021, . . . [and] was able to observe a pair of Red Tailed Hawks, . . . Eastern Meadowlark and Killdeer." Pl.'s Compl., Ex. C, ¶ 9. Most recently she visited the area "on September 23, 2021, . . . with John Jack White . . . to learn about the high level of biodiverse plant life." Pl.'s Compl, Ex. C, ¶ 10. She states that she hopes "that people, including my own children, will be able to enjoy places like Bell Bowl Prairie and the incredible amount of diversity that exists there for many years to come." Pl.'s Compl, Ex. C, ¶ 12. Ms. Kuroda's declaration does not establish that she regularly uses or visits the Prairie, or that she has concrete plans to do so in the future. Moreover, she has no right or ability to use or enjoy the Prairie now or in the future. As such, the declaration of Ms. Kuroda also fails to establish standing for NLI.

Plaintiffs fail to allege they have suffered an injury that is "actual or imminent, not 'conjectural or hypothetical.'" *Lujan II,* 504 U.S. at 560. Plaintiff's "'some day' intentions—

12

without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Summers,* 555 U.S. at 496 (quoting *Lujan II,* 504 U.S. at 564). Plaintiff fails to allege how GRAA's actions would result in an imminent injury to their members' interests. This is insufficient and impermissible. *See Summers,* 555 U.S. at 496 (holding organizations did not have standing based on member's purported intention to visit unnamed National Forests in the future); *Shawnee Trail Conservancy v. Nicholas,* 343 F.Supp.2d 687 (S.D. Ill. 2004) (holding organizations' general allegations in the complaint that their members used national forest and had concrete plans to do so in the future were not enough to establish Article III standing).

Another important element of the standing doctrine is the prohibition against generalized grievances. *Lujan II,* 504 U.S. at 575. Where a plaintiff fails to demonstrate how a widely shared injury will impact the plaintiff in a particularized way, the Supreme Court has refused to find that the plaintiff has standing. *See United States v. Richardson,* 418 U.S. 166, 176–77 (1974) (stating that generalized grievances do not give rise to a concrete injury); *Lujan II,* 504 U.S. at 573–74. As stated previously, the Prairie is located on private property, and the declarants lack the right to enter the land, without permission from GRAA. *See Protect Our Parks, Inc. v. Chicago Park District,* 971 F.3d 722 (7th Cir. 2020) ("plaintiffs can't repackage an injury to the park as an injury to themselves"). NLI's claims focus on GRAA's activity on its private land, and the resulting impact to the Prairie, rather than harm to their concrete and particularized interests. In sum, the impact the challenged activity has on NLI is "plainly undifferentiated and 'common to all members of the public.'" *Lujan II,* 504 U.S. at 575 (quoting *Richardson,* 418 U.S. at 171).

NLI's attempt to exert control over the airport's development is puzzling. While some plaintiffs have successfully used environmental claims to challenge activity adversely impacting

their use and enjoyment of a property they owned, or publicly held land such as a federal or state park, the subject land in this case does not fit either category. The Prairie, situated next to an airport runway, is not an area used for "recreation" or "aesthetic enjoyment" by the public. *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). The proposed construction is not situated near an NLI member's home. *See Covington v. Jefferson County,* 358 F.3d 626 (9th Cir. 2003) (holding that homeowners have standing to sue where waste from defendant's landfill caused the groundwater under plaintiffs' property to be contaminated). The development cannot be analogized to pollution of a river or the air. *See Citizens for a Better Env. v. Caterpillar, Inc.,* 30 F.Supp.2d 1053, 1057 (C.D. Ill. 1998) (members of a citizen group who lived near a river allege adequate standing where they discontinued use and recreation near the river due to pollution). As such, NLI has failed to allege an actual or imminent injury.

C.    **NLI CANNOT SHOW IT HAS STANDING BECAUSE THE ALLEGED INJURIES OF NLI AND ITS MEMBERS WILL NOT BE REDRESSED BY A FAVORABLE DECISION IN THIS CASE**

One of the elements NLI must establish to show it has standing to bring its claim in this case is redressability. In addition to the injury in fact discussed above, NLI must also demonstrate that it is "likely," as opposed to merely "speculative," that the injury complained of will be "redressed by a favorable decision." *Lujan II,* 504 U.S. at 560. Here, none of the relief sought in NLI's Complaint—declaratory judgment that the FAA's November 25, 2019 Final Environmental Assessment is no longer valid; declaratory judgment that the FAA's and USFWS findings are arbitrary and capricious under the APA; an order requiring a supplemental environmental assessment; an injunction restraining the FAA and GRAA from further development; an injunction restraining GRAA from moving any plant or wildlife from the prairie or beginning construction until a supplemental environmental assessment and review; an injunction restraining GRAA from violating the alleged agreement with NLI; and to reimburse Plaintiff's litigation expenses—would

14

redress the "injuries" sustained by declarants, the NLI members who previously visited the Prairie, but no longer do so and have no specific plans to do so in the future. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 84–85 (1998); *Caterpillar, Inc.,* 30 F.Supp. at 1061.

The relevant showing for Article III standing is not injury to the environment, but injury to the plaintiff. *Laidlaw,* 528 U.S. at 168 (2000). A positive ruling would not directly affect the declarants' recreational or aesthetic interest because NLI's members would still not have a right to visit the property. The land is not a national park, or a forest preserve; rather, it is situated next to a runway on private property. *C.f. Sierra Club v. Marita,* 46 F.3d (7th Cir. 1995) (citizen group's use and enjoyment of specific national forests was sufficient to allege a concrete and legally cognizable injury); *Heartwood, Inc. v. U.S. Forest Service,* 230 F.3d 947 (7th Cir. 2000) (plaintiffs adequately alleged a concrete injury where they claimed that their use of certain national forests was harmed). Because NLI lacks a legal interest in the private land, a court ruling in their favor still would not create a right for them to visit, use, or enjoy the subject property. Plaintiffs have therefore failed to establish the element of redressability, as required for Article III standing. Accordingly, the GRAA Defendants' Motion to Dismiss should be granted, and NLI's Complaint should be dismissed pursuant to Rule 12(b)(1).

## V.    CONCLUSION

For all the reasons stated above, NLI fails to establish that NLI or its members have standing to assert its claims against the GRAA Defendants in this case. NLI and its members are unable to establish the requisite injury, and they cannot show that a favorable outcome in this case is likely to redress their purported injuries. Accordingly, the GRAA Defendants' Motion to Dismiss should be granted, and NLI's Complaint should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

Dated: December 17, 2021          Respectfully submitted,

/s/ Thomas J. Lester
Thomas J. Lester (ARDC # 6189291)
Devin B. Noble (ARDC # 6306644)
Allen Galluzzo Hevrin Leake, LLC
6735 Vistagreen Way, Suite 110
Rockford, IL 61107
(815) 265-6464
tlester@aghllaw.com
dnoble@aghllaw.com
*Attorneys for Defendants, The Greater Rockford Airport Authority, The Greater Rockford Airport Authority Board of Commissioners, and Michael P. Dunn, Executive Director of the Greater Rockford Airport Authority*

16

# EXHIBIT A

## DECLARATION OF ZACK OAKLEY

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

NATURAL LAND INSTITUTE,                    )
                                            )
*Plaintiff,*                                )
                                            )
v.                                          )    Case No. 21-cv-50410
                                            )
THE GREATER ROCKFORD                        )
AIRPORT AUTHORITY, et al.                   )
                                            )
*Defendants.*                               )
                                            )

## DECLARATION OF ZACK OAKLEY

I, Zack Oakley, hereby declares as follows:

1.     The facts set forth in this Declaration are based on my personal knowledge. If called as a witness, I could and would testify competently to these facts.

2.     I am Deputy Director of Operations and Planning for the Greater Rockford Airport Authority and am familiar with the land that is the subject matter of the above-captioned case and the Airport's plans for development for the Midfield Air Cargo Expansion.

3.     Attached to this Declaration as Exhibit 1 is a true and accurate copy of the deed transferring the former grant property owned by the Federal Government to the Greater Rockford Airport Authority.

4.     The property that is the subject of NLI's lawsuit is owned by the Greater Rockford Airport Authority.

5.     The Greater Rockford Airport Authority has fenced in the subject lands and has posted no trespassing signs all along the borders of the subject property.

6.     The subject property is not accessible to NLI, its members or agents or to the public in general.

7.     Attached to this Declaration as Exhibit 2 is a copy of a letter sent by the Chairman of the Greater Rockford Airport Authority to Kerry Leigh, the President of NLI, informing her that

any agreement that may exist between NLI and the Greater Rockford Airport Authority is terminated, effective immediately. I have retained a copy of that letter in the Airport's files in the normal course of business.

8.      Attached to this Declaration as Exhibit 3 is a copy of the correspondence sent by the Greater Rockford Airport Authority's counsel to NLI's counsel dated November 9, 2021, informing NLI's counsel that NLI and its agents will not be allowed access to the Airport property going forward. I have maintained a copy of said letter in the Airport's files in the normal course of business.

9.      Attached to this Declaration as Exhibit 4 is a true and accurate copy of Resolution 20-71 passed by the Board of Commissioners at it regular meeting on December 15, 2021.

FURTHER DECLARANT SAYETH NOT

ZACK OAKLEY

Subscribed and sworn to before me this
_16th_ day of _December_, 2021.

NOTARY PUBLIC

KATHY J BRUGGEMAN
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 16, 2024

Thomas J. Lester, IL ARDC No. 6189291
Devin B. Noble, IL ARDC No. 6306644
Allen Galluzzo Hevrin Leake, LLC
6735 Vistagreen Way, Suite 110
Rockford, IL 61107
Phone:  (815) 265-6464
Fax:    (815) 321-4242
E-mail: tlester@aghllaw.com
        dnoble@aghllaw.com
Attorneys for Defendant Greater Rockford Airport Authority

# EXHIBIT 1

## OF THE DECLARATION OF ZACK OAKLEY

WD-768 (W-Ill-81)
Greater Rockford Airport Authority
Rockford, Illinois
Contract No. WS-5(s)-677

QUITCLAIM DEED

627  397

THIS INDENTURE, made this 11th day of August 1948,
between the UNITED STATES OF AMERICA, acting by and through the War
Assets Administrator, under and pursuant to Reorganization Plan One of
1947 (12 Fed. Reg. 4534) and the powers and authority contained in the
provisions of the Surplus Property Act of 1944, as amended, and applicable
rules, regulations and orders, party of the first part, and GREATER
ROCKFORD AIRPORT AUTHORITY, a municipal corporation under the laws of the
State of Illinois, party of the second part,

WITNESSETH, THAT, the said party of the first part, for and in
consideration of the assumption by the party of the second part of all
the obligations and its taking subject to certain reservations, restric-
tions and conditions and its covenant to abide by and agreement to certain
other reservations, restrictions and conditions, all as set out hereinafter,
conveys and quitclaims to the said party of the second part, it successors
and assigns forever, under and subject to the reservations, restrictions
and conditions, exceptions, and reservation of fissionable materials and
rights hereinafter set out, all its right, title and interest in the follow-
ing described property situate in the County of Winnebago, State of Illinois,
to-wit:

That part of the East half of Sections eleven (11)
and fourteen (14), Township 43 North, Range 1 East
of the Third Principal Meridian, bounded on the
South by the South line of Section 14, bounded on
the East by the West right-of-way of the CB&Q RR.,
bounded on the North by the N. line of the S. 1/4
of Section 11, and bounded on the West by the half
section line of Sections 11 and 14, (except a parcel
500 feet wide and 2000 feet long, lying along the
half section line aforesaid and heretofore conveyed
by United States of America to Greater Rockford
Airport Authority of the City of Rockford, County
of Winnebago, and State of Illinois by Quitclaim Deed
dated November 25th, 1947, and recorded in the Re-
corder's Office of Winnebago County, Illinois, as
document number 580,670).

Title to said lands, comprising approximately 153.5 acres, having
been acquired by the United States of America as a part of that former military
installation known as Camp Grant, Illinois.

TOGETHER WITH buildings, structures and improvements erected and
owned by United States of America and described as follows:

627  398

TOGETHER WITH buildings, structures and improvements erected and owned by United States of America and described as follows:

BUILDINGS:  Numbered T-102, T-103, T-104, T-105, T-106, T-343, T-108, T-215, T-217, T-237, T-255, T-318, T-367, T-1604, T-1605, T-1606, T-1607, T-1609, T-1610, T-1612, T-1613, T-1614, T-1615, T-1618, T-1620, T-1640, T-1641, T-1642 and T-1643.

IMPROVEMENTS:  One Incinerator, Two Water Towers and all other overhead and underground utilities presently existing on the land area conveyed by this instrument, including water, sewage, electric, telephone, other utility systems, and all railroad trackage situate over, upon or under the premises conveyed hereby:

TOGETHER WITH the following described easements:

An easement and right-of-way for the free and unobstructed passage of aircraft in, through and across the air space above the lands in Winnebago County, Illinois, described as follows:

The north 1/2 of the northeast 1/4 of Section 11, Township 43 North, Range 1 East of the 3rd P.M., with the exception of the right-of-way properties of the Chicago, Burlington & Quincy Railroad Co. and the Chicago, Milwaukee, St. Paul & Pacific Railroad Co., which traverse the same;

The southeast 1/4, the west 1/2 of the northeast 1/4, the east 1/2 of the southwest 1/4 and the northwest 1/4 with the exception of that portion of the said northwest 1/4 described as follows:

Commencing at the northwest corner of said Section, thence south 7 chains and 90 links, thence easterly 6 chains and 45 links, thence north parallel with the west line of said section, 7 chains and 49 links to the section line, thence west 6 chains and 45 links to the place of beginning.

All in Section 12, Township 43 North, Range 1 East of the 3rd P.M.

The Northeast 1/4, the Southeast 1/4, the Southwest 1/4 and the East 1/2 of the Northwest 1/4 of Section 13, Township 43 North, Range 1 East of the 3rd P.M.;

The North 1/2 of the Northeast 1/4 of Section 24, Township 43 North, Range 1 East of the 3rd P..., together with the east 11 acres of the southeast 1/4 of the Northwest 1/4 of Section 24;

The West 1/2 of the northwest 1/4 of Section 19, Township 43 North, Range 2 East of the 3rd P.M.;

627 - 399

All that portion of the southwest 1/4 of Section 14,
Township 43 North, Range 1 East of the 3rd P.M. lying
East of the Easterly right-of-way line of the Chicago,
Milwaukee, St. Paul & Pacific R.R. Co. tracks;

All that portion of the North 1/2 of the Northeast 1/4
of Section 23, Township 43 North, Range 1 East of the
3rd P.M. lying east of the easterly right-of-way line of
the Chicago, Milwaukee, St. Paul & Pacific R. R. Co.
tracks;

The easement and right-of-way for the free and unobstructed passage
of aircraft in, through and across the air spaces above the land described
immediately above includes a permanent and continuing easement and right-of-
way to enter upon the said land and remove from and clear said land of any
and all obstructions situate thereon or thereover which may exceed 150 feet
in height and for this purpose to cut and remove therefrom trees, underbrush
and soil and to demolish and remove therefrom buildings or any other struc-
tures or obstructions extending to a height greater than 150 feet above the
surface of the earth.

There is further conveyed hereby to the party of the second part
a permanent and continuing easement and right-of-way to enter upon certain
specified tracts within the land area over which the foregoing avigation
easement is granted and remove from and clear the same of any and all ob-
structions situate thereon or thereover which may exceed certain varying
heights less than 150 feet above the surface of the earth, said heights
having been determined in accordance with the layout plan of the Greater
Rockford Airport, and for this purpose to cut and remove therefrom trees,
underbrush and soil and to demolish and remove therefrom buildings or any
other structures or obstructions extending to a greater height than that
specified below for the said tracts. The specified tracts over which this
easement and right-of-way is granted, together with the specified maximum
heights therefor, any structures or growth above which maximum heights may
be removed, is as follows:

To enter upon that part of the north 1/2 of the northeast 1/4
of Section 11, lying west of the westerly right-of-way line
of the Chicago, Burlington & Quincy R.R. Co. tracks and remove
therefrom any structure or obstruction which may exceed 75
feet above the surface of the earth.

To enter upon that part of the south 1/2 of the east 1/2 of the
southwest 1/4 of Section 12 and remove therefrom any structure
or obstruction which may exceed 45 feet above the surface of
the earth.

-5-

627    400

To enter upon that part of the southwest ¼ of the southeast ¼ of Section 12 and remove therefrom any structure or obstruction which may exceed 63 feet above the surface of the earth.

To enter upon the northwest ¼ of the Northeast ¼ of Section 13 and remove therefrom any structure or obstruction which may exceed 43 feet above the surface of the earth.

To enter upon the northeast ¼ of the northwest ¼ of Section 13 and remove therefrom any structure or obstruction exceeding 43 feet above the surface of the earth.

To enter upon the southeast ¼ of the Northwest ¼ of Section 13 and remove therefrom any structure or obstruction exceeding 45 feet above the surface of the earth.

To enter upon the northwest ¼ of the southwest ¼ of Section 13 and remove therefrom any structure or obstruction exceeding 85 feet above the surface of the earth.

To enter upon that part of the southeast ¼ of Section 14 lying east of the easterly right-of-way line of the Chicago, Milwaukee, St. Paul and Pacific R. R. Co. tracks and remove therefrom any structure or obstruction exceeding 5 feet above the surface of the earth.

To enter upon that portion of the south ½ of the north ½ of the northeast ¼ of Section 23 lying East of the easterly right-of-way line of the Chicago, Milwaukee, St. Paul & Pacific R. R.Co. tracks and remove therefrom any structure or obstruction exceeding zero (0) feet above the surface of the earth, and to enter upon the above tract of land for purposes of removal of ground contours extending into the approach glide angle plane which rises at a grade of 50 feet to 1 foot starting at a point 200 feet south of the southeast end of the northwest/southeast runway and from an elevation which is equal to that of the southeast end of northwest-southeast runway, being approximately 731 feet plus or minus above sea level.

To enter upon that portion of the north ½ of the north ½ of the northeast ¼ of Section 23 lying east of the easterly right-of-way line of the Chicago, Milwaukee, St. Paul & Pacific R. R. Co.tracks and remove therefrom any structure or obstruction exceeding 20 feet above the surface of the earth.

To enter upon that portion of the southwest ¼ of the northwest ¼ of the northwest ¼ of section 24 and remove therefrom any structure or obstruction exceeding 113 feet above the surface of the earth.

All in Township 45 North, Range 1, East of the 3rd P.M., Winnebago County, Illinois.

A perpetual easement for the construction and maintenance of an open storm sewer acquired by Declaration of Taking, dated April 15, 1941, in the United States District Court for the Northern District of Illinois, Western Division, which is of record in said court in the case of the United States of Illinois vs. C. J. Samuelson, et al.

The easements conveyed immediately above are for use and benefit of that tract of land which is conveyed by this instrument and that tract of

627 :401

land conveyed by the Government to the party of the second part by quitclaim deed executed under date of November 25, 1947, and recorded in the Office of the Recorder of Deeds for Winnebago County, Illinois, under date of November 25, 1947, at page 1, Book 597 of Records, all of which is known as the Greater Rockford Airport area.

The above described premises are transferred subject to existing easements for roadways, highways, public utilities, railways and pipelines.

EXCEPTING, HOWEVER, from this conveyance all right, title and interest in and to all its property in the nature of equipment, furnishings and other personal property located on the above described premises which can be removed from the land without material injury to the land or structures located thereon, other than property of such nature located on the premises conveyed hereby which is reasonably necessary for the operation or maintenance of the airport or for the operation or maintenance of the structures and improvements specifically listed hereinafter as being transferred hereby, for any reasonable use for which such structures or improvements are readily adaptable; and further excepting from this conveyance all its structures on said premises other than structures specifically described or enumerated above as being conveyed hereunder; and reserving to the party of the first part for itself and its lessees, licensees, permittees, agents and assigns the right to use the property and structures excepted hereby in such a manner as will not materially and adversely affect the development, improvement, operation or maintenance of the airport and the right of removal from said premises of such property and structures, all within a reasonable period of time after the date hereof, which shall not be construed to mean any period more than one (1) year after the date of this instrument, together with a right of ingress to and egress from said premises for such purposes.

And further excepting from this conveyance and reserving to the party of the first part, in accordance with Executive Order 9908, approved on December 5, 1947, (12 Fed. Reg. 8223), all uranium, thorium, and all other materials determined pursuant to section 5(b)(1) of the Atomic Energy

-5-

627   402

Act of 1946 (60 Stat. 761), to be peculiarly essential to the production of
fissionable material, contained, in whatever concentration, in deposits in the
lands covered by this instrument are hereby reserved for the use of the United
States, together with the right of the United States through its authorized
agents or representatives at any time to enter upon the land and prospect
for, mine, and remove the same, making just compensation for any damage or
injury occasioned thereby. However, such land may be used, and any rights
otherwise acquired by this disposition may be exercised, as if no reservation
of such materials had been made; except that, when such use results in the
extraction of any such material from the land in quantities which may not be
transferred or delivered without a license under the Atomic Energy Act of
1946, as it now exists or may hereafter be amended, such materials shall be
the property of the United States Atomic Energy Commission, and the Commission
may require delivery of such material to it by any possessor thereof after any
such material has been separated as such from the ores in which it was contained.
If the Commission requires the delivery of such material to it, it shall pay
to the person mining or extracting the same, or to such other person as the
Commission determines to be entitled thereto, such sums, including profits,
as the Commission deems fair and reasonable for the discovery, mining, develop-
ment, production, extraction, and other services performed with respect to such
material prior to such delivery, but such payment shall not include any amount
on account of the value of such material before removal from its place of deposit
in nature. If the Commission does not require delivery of such material to it,
the reservation hereby made shall be of no further force or effect.

In addition, this conveyance is made subject to the right of the
Public Housing Administration to use in place and/or dismantle and remove certain
buildings and structures constituting the emergency housing unit as now located
upon the area conveyed above, together with the right to use the land areas surround-
ing the said emergency housing unit with full rights of ingress and egress, neces-
sary for the operation and/or dismantling of said housing unit, as determined by
the Public Housing Administration, and to the usage of all utilities situate upon
or under the said emergency housing area in accordance with the terms of the
Agreement of Conveyance entered into between the United States of America, acting
by and through the War Assets Administrator, and the Greater Rockford Airport
Authority under date of November 25, 1947. It is agreed that the rights herein-
above reserved shall remain in force for so long as needed for the operation of
the said emergency housing project, as determined by Public Housing Administration.

-6-

627    403

Said property transferred hereby was duly declared surplus and was assigned to the War Assets Administrator for disposal, acting pursuant to the provisions of the above mentioned Act, as amended, Reorganization Plan One of 1947, (12 Fed. Reg. 4534) and applicable rules, regulations and orders.

TO HAVE AND TO HOLD said premises, with appurtenances, except the fissionable materials and other property excepted above and the rights reserved above, and under and subject to the reservations, restrictions and conditions set forth in this instrument, unto the said party of the second part, its successors and assigns forever.

By the acceptance of this deed or any rights hereunder, the said party of the second part, for itself, its successors and assigns agrees that the transfer of the property transferred by this instrument, is accepted subject to the following restrictions set forth in subparagraphs (1) and (2) of this paragraph, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Surplus Property Act of 1944, as amended, Reorganization Plan One of 1947 (12 Fed. Reg. 4534) and applicable rules, regulations and orders:

(1)    That, except as provided in subparagraph (6) of the next succeeding unnumbered paragraph, the land, buildings, structures, improvements and equipment in which this instrument transfers any interest shall be used for public airport purposes for the use and benefit of the public, on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right for use of the airport within the meaning of the terms "exclusive right" as used in subparagraph (4) of the next succeeding paragraph. As used in this instrument, the term "airport" shall be deemed to include at least all such land, buildings, structures, improvements and equipment.

(2)    That, except as provided in subparagraph (6) of the next succeeding paragraph, the entire landing area, as defined in WAA Regulation 16, dated June 26, 1946, and all structures, improvements, facilities and equipment in which this instrument transfers any interest shall be maintained for the use and benefit of the public at all times in good and serviceable condition, provided, however, that such maintenance shall be required as to structures, improvements, facilities and equipment only during the remainder of their estimated life, as determined by the Civil Aeronautics Administrator or his successor. In the event materials are required to rehabilitate or repair certain of the aforementioned structures, improvements, facilities or equipment,

-7-

627   404

they may be procured by demolition of other structures,
improvements, facilities or equipment transferred hereby
and located on the above described premises which have out-
lived their use as airport property in the opinion of the
Civil Aeronautics Administrator or his successor.

By the acceptance of this deed or any rights hereunder, the
said party of the second part for itself, its successors and assigns, also
assumes the obligations of, covenants to abide by and agrees to, and this
transfer is made subject to, the following reservations and restrictions
set forth in subparagraphs (1) to (7), inclusive, of this paragraph, which
shall run with the land, imposed pursuant to the authority of Article 4,
Section 3, Clause 2 of the Constitution of the United States of America,
the Surplus Property Act of 1944, as amended, Reorganization Plan One of
1947 (12 Fed. Reg. 4534) and applicable rules, regulations and orders:

(1)   That insofar as it is within its powers, the party of the
      second part shall adequately clear and protect the aerial
      approaches to the airport by removing, lowering, relocating,
      marking or lighting or otherwise mitigating existing airport
      hazards and by preventing the establishment or creation of
      future airport hazards.

(2)   That the United States of America (hereinafter sometimes
      referred to as the "Government") through any of its employees
      or agents shall at all times have the right to make non-
      exclusive use of the landing area of the airport at which
      any of the property transferred by this instrument is
      located or used, without charge: Provided, however, that such
      use may be limited as may be determined at any time by the
      Civil Aeronautics Administrator or his successor to be necessary
      to prevent undue interference with use by other authorized
      aircraft: Provided, further, that the Government shall be
      obligated to pay for damages caused by such use, or if its
      use of the landing area is substantial, to contribute a

-8-

627    405

reasonable share of the cost of maintaining and oper-
ating the landing area, commensurate with the use made
by it.

(3) That during any national emergency declared by the
President of the United States of America or the Con-
gress thereof, the Government shall have the right
to make exclusive or nonexclusive use and have ex-
clusive or nonexclusive control and possession, with-
out charge, of the airport at which any of the pro-
perty transferred by this instrument is located or
used, or of such portion thereof as it may desire,
provided, however, that the Government shall be re-
sponsible for the entire cost of maintaining such
part of the airport as it may use exclusively, or over
which it may have exclusive possession or control, during
the period of such use, possession, or control, and shall
be obligated to contribute a reasonable share, commensur-
ate with the use made by it, of the cost of maintenance
of suchproperty as it may use nonexclusively or over which
it may have nonexclusive control and possession; provided,
further, that the Government shall pay a fair rental for
its use, control, or possession, exclusively or non-
exclusively of any improvements to the airport made with-
out United States aid.

(4) That no exclusive right for the use of the airport at
which the property transferred by this instrument is
located shall be vested (directly or indirectly) in
any person or persons to the exclusion of others in the
same class, the term "exclusive right" being defined to
mean:

-6-

627    406

(1) any exclusive right to use the airport for con-
ducting any particular aeronautical activity
requiring operation of aircraft;

(2) any exclusive right to engage in the sale or
supplying of aircraft, aircraft accessories,
equipment or supplies (excluding the sale of
gasoline and oil), or aircraft services neces-
sary for the operation of aircraft (including
the maintenance and repair of aircraft, air-
craft engines, propellers, and appliances.)

(5) That, except as provided in subparagraph (6) of this
paragraph, the property transferred hereby may be succes-
sively transferred only with the proviso that any such
subsequent transferee assumes all the obligations imposed
upon the party of the second part by the provisions of
this instrument.

(6) That no property transferred by this instrument shall be
used, leased, sold, salvaged, or disposed of by the party
of the second part for other than airport purposes without
the written consent of the Civil Aeronautics Administrator, which
shall be granted only if said Administrator determines that
the property can be used, leased, sold, salvaged or dis-
posed of for other than airport purposes without materially
and adversely affecting the development, improvement, oper-
ation or maintenance of the airport at which such property
is located; provided, that no structures disposed of hereunder
shall be used as an industrial plant factory, or similar facility
within the meaning of Section 23 of the Surplus Property Act of
1944, as amended, unless the party of the second part shall pay
to the United States such sum as the War Assets Administrator
or his successor in function shall determine to be a fair con-
sideration for the removal of the restriction imposed by this
proviso.

-10-

627  407

(7) The party of the second part does hereby release the Government, and will take whatever action may be required by the War Assets Administrator to assure the complete release of the Government from any and all liability the Government may be under for restoration or other damages under any lease or other agreement covering the use by the Government of the airport, or part thereof, owned, controlled or operated by the party of the second part, upon which, adjacent to which, or in connection with which, any property transferred by this instrument was located or used; Provided, that no such release shall be construed as depriving the party of the second part of any right it may otherwise have to receive reimbursement under Section 17 of the Federal Airport Act for the necessary rehabilitation or repair of public airports heretofore or hereafter substantially damaged by any Federal Agency.

By acceptance of this instrument or any rights hereunder, the party of the second-part further agrees with the party of the first part as follows:

(1) That in the event that any of the aforesaid terms, conditions, reservations or restrictions is not met, observed, or complied with by the party of the second party or any subsequent transferee, whether caused by the legal inability of said party of the second part or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title, right of possession and all other rights transferred by this instrument to the party of the second part, or any portion thereof, shall at the option of the party of the first part revert to the party of the first part sixty (60) days following the date upon which demand to this effect is made in writing by the Civil Aeronautics Administrator or his successor in function, unless within said sixty (60) days such default or violation shall have been cured and all such terms, conditions, reservations and restrictions shall have been met, observed or com-

627    408

plied with , in which event said reversion shall

not occur and title, right of possession, and all

other rights transferred hereby, except such, if any,

as shall have previously reverted,shall remain vested

in the party of the second part, its transferees, suc-

cessors and assigns.

(2)    That if the construction as covenants of any of the

foregoing reservations and restrictions recited herein

as covenants or the application of the same as coven-

ants in any particular instance is held invalid, the

particular reservations or restrictions in question shall

be construed instead merely as conditions upon the breach

of which the Government may exercise its option to cause

the title, right of possession and all other rights trans-

ferred to the party of the second part, or any portion

thereof, to revert to it, and the application of such reserv-

ations or restrictions as covenants in any other instance

and the construction of the remainder of such reservations

and restrictions as covenants shall not be affected thereby.

IN WITNESS WHEREOF, the party of the first part has caused these

presents to be executed as of the day and year first above written.

                                    UNITED STATES OF AMERICA
                                    Acting by and through
                                    War Assets Administrator

                                    By _____ (SEAL)
                                       Joseph A. Burke
                                       Deputy Regional Director
                                       for Real Property Disposal
                                       War Assets Administration

WITNESSES:

-12-

627    409

STATE OF ILLINOIS )
                  ) SS
COUNTY OF COOK    )

I, *Carolyn Westgate*, a Notary Public in and for said State and County aforesaid, do certify that on this 11th day of *August* 1948, before me appeared Joseph A. Burke, Deputy Regional Director, War Assets Administration, Chicago, Illinois, to me personally known, and known to me to be such Deputy Regional Director of the War Assets Administration, who being by me duly sworn did say that he was such Deputy Regional Director, and that he signed his name to said deed in pursuance of proper authority, that said deed was signed by him, as such Deputy Regional Director, War Assets Administration, on behalf of the United States of America; and that said Joseph A. Burke acknowledged the execution of said deed to be his free act and deed as such Deputy Regional Director, the free act and deed of the United States of America by the War Assets Administration, acting for the United States of America, and that said Administration has no official seal.

IN WITNESS WHEREOF, I hereunto set my hand at Chicago, Illinois, in the County and State aforesaid, on the date last above written.

*Carolyn Westgate*
Notary Public

(NOTARIAL SEAL)

My Commission Expires:

*August 30, 1949*

Document No. **602381**    Book **627** Page **397**
Filed for Record in Recorder's office of Winnebago County, Illinois,
AUG 11 1948    at 2:35 o'clock P. M
*John A. Bowman*    Recorder of Deeds

# EXHIBIT 2

## OF THE DECLARATION OF ZACK OAKLEY



**CHICAGO ROCKFORD** INTERNATIONAL AIRPORT

November 8, 2021

Ms. Carrie Leigh
Natural Land Institute
320 South Third Street
Rockford, IL 61104

Dear Ms. Leigh:

I am writing on behalf of the Greater Rockford Airport Authority (the "Authority"). It is come to our attention through a federal lawsuit filed by you, that the Natural Land Institute believes that it has some form of contract or agreement with the Authority as it relates to certain property owned by the Authority. The Authority is not aware of any written agreement between Natural Land Institute and the Authority. However, if any such agreement does exist, notice is hereby given that any such contract or agreement is terminated effective immediately.

Very truly yours,

Paul R. Cicero
Chairman of the Board of Commissioners

c:      Board of Commissioners
        Michael P. Dunn, Executive Director

# EXHIBIT 3

## OF THE DECLARATION OF ZACK OAKLEY



6735 Vistagreen Way Suite 110 | Rockford, IL 61107-5643
815.265.6464 | www.aghllaw.com

November 9, 2021

**VIA EMAIL: jrussell@vonbriesen.com**

Mr. Joseph M. Russell
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202

*Re:    Natural Land Institute v. The Greater Rockford Airport Authority, et al. (N. D. Ill.)*
*        (Case No. 21-cv-50410)*

Dear Joe:

          I am writing on behalf of the Greater Rockford Airport Authority (the "Authority"). Attached is a copy of a letter that was sent to Carrie Leigh of the Natural Land Institute ("NLI"). The letter is self-explanatory.

          In response to some of your questions raised in your previous emails and your letter dated November 5, 2021, please be advised that NLI and its agents will not be allowed access to the Airport's property going forward. As you know, the Airport is currently involved in a Section 7 Consultation with the FAA, USFWS and IDNR relating to the property owned by the Airport that is part of the cargo development project. The area needs to remain undisturbed during this process. In addition, NLI has made the land in question the subject of a lawsuit it filed in Federal Court and the Airport will not allow the land to be accessed during the pendency of that lawsuit. Finally, the land is private property. It is not a park. There is construction and heavy truck traffic in the area. For the safety of the public and all concerned, as well as the security of the Airport, public access to the property in question will not be allowed for any reason.

          Your letter of November 5, 2021 refers to a contract or agreement. The Authority is not aware of any written agreement between NLI and the Authority. In your letter you state: "[A]s you are aware, NLI was formally given custody and responsibility of Bell Bowl Prairie by GRAA as part of a Master Plan and resolution passed November 1, 1977." First of all, nothing within the Resolution transfers control or custody of the so-called Bell Bowl Prairie to NLI. The Resolution does provide that "the Greater Rockford Airport Authority shall make every effort possible to preserve as a nature preserve the area outlined in red on the map attached to this Resolution so long as the preservation of the same as a nature preserve shall not interfere with the necessary operation of Airport." The Authority has never been provided a copy of the map referred to in the Resolution nor does the Authority have any record the Resolution was actually approved by the Board of Commissioners on November 1, 1977, or any other date. However, assuming arguendo the Resolution was passed by the Board of Commissioners and the map refers to the Bell Bowl Prairie, that property is now necessary for the operation of the Airport. Furthermore, the last paragraph of the Resolution talks about an agreement to be drafted for "management and access of said area to the Natural Land Institute… said agreement to be on a five year basis with renewal unless terminated by either party." While the Authority doesn't believe any such agreement was

November 9, 2021
Page 2 of 2

ever drafted or signed by the parties, even if such an agreement actually exists, it has been terminated by the Authority effective immediately by the attached letter.

NLI attached a document as Exhibit F to the Complaint titled Master Plan for Bell Bowl Prairie Winnebago County, Illinois. There is no record at the Authority that it ever reviewed or approved that document. That document is not signed by either the Authority or NLI and does not form the basis of an agreement. That document does not form or impose any legal obligations on either NLI or the Authority.

There is no dispute that over the years the Authority has voluntarily allowed NLI and others access to the Prairie area. However, there was never any agreement that the access would be permanent nor was there ever an agreement on the part of the Authority that it ever transferred custody of any of its property to NLI. The word custody does not appear in the November 1, 1977, Resolution.

As to any activity on the Bell Bowl Prairie, pursuant to the Stipulation, there is no grading, earth moving or other construction activity currently on any part of the Bell Bowl Prairie. There is vertical construction going on at the airfield on the 100,000 sq. ft. air cargo facility as well as an apron being constructed east of that building. The Stipulation, consistent with the prayer for relief in NLI's Complaint, only relates to construction activity on or in the Bell Bowl Prairie, not existing construction projects that are on the airfield. The Authority will abide by the Stipulation filed with the Court until the earlier of March 1, 2022 or when the lawsuit is dismissed by the Court.

Given the fact that NLI has chosen to file suit against the Authority and various other Defendants, the Authority is not going to confirm or deny any maps or photographs that you attached to your November 5, 2021 correspondence. In any event, those exhibits, if they can be authenticated, speak for themselves.

Finally, until the FAA, the USFWS and IDNR have completed their evaluation, the Authority does not believe that a meeting with NLI would be constructive and therefore declines NLI's invitation to meet this Thursday.

Very truly yours,

Thomas J. Lester

ALLEN GALLUZZO HEVRIN LEAKE, LLC
6735 Vistagreen Way, Suite 110
Rockford, IL 61107
(815) 414-5530
tlester@aghllaw.com

Enclosure

# EXHIBIT 4

## OF THE DECLARATION OF ZACK OAKLEY

## RESOLUTION NO. 21-71

**WHEREAS**, there has been a significant growth at the Greater Rockford Airport Authority (the "Authority") since 1977; and

**WHEREAS**, it is in the best interests of the Authority's and the greater Rockford Region as a whole that the Airport continues to grow and add jobs and more economic growth to the Rockford Region; and

**WHEREAS**, Greater Rockford Airport Authority has significantly increased its passenger service from 1977 and currently has more than 230,000 travelers passing through its doors each year; and

**WHEREAS**, Greater Rockford Airport Authority has grown since 1977 when it had virtually no air cargo traffic to now being ranked as 17th largest airport in the nation for air cargo volume; and

**WHEREAS**, Chicago Rockford International Airport (RFD) is one of the largest economic engines for the Rock River Valley and Northern Illinois.
- Home to over 70 businesses/tenants
- Current employment on airport totals **more than 8,000 skilled** jobs in aviation, transportation, logistics, and construction.
- **RFD and its tenants pay millions of dollars in real estate taxes** each year that directly fund Police, Fire, Schools, Roads, and other necessary governmental services; and

**WHEREAS**, RFD and its partners create **$4.7 billion** in economic impact to the region's economy on an annual basis. RFD and its partners are responsible for 21,476 jobs related to Airport activities providing over $1.4 billion annually in salary and wages. That economic impact will continue to add exponentially with new and future projects, such as the current $50 million air cargo expansion – which is 65% complete – to the region's economic vitality; and

**WHEREAS**, among the many projects the Airport and its partners have announced and/or achieved recently include the construction of this new $50 million international cargo center.

**WHEREAS, in the past year**, RFD and its partners have created over 1,000 new private industry jobs, bringing the total jobs on the airport campus to over 8,000. These jobs represent irreplaceable contributions that directly impact family households and local businesses by billions of dollars each year; and

**WHEREAS**, over the past few years more than $225 million has been invested in infrastructure improvements and facilities at RFD; and

**WHEREAS**, the $50 million cargo center expansion is just one part of the Airport's ongoing development projects to support its increased cargo activity. The ongoing growth will continue to positively impact the region's economic development and our residents' taxes/return on investment (ROI); and

**WHEREAS**, according to US Trade Numbers which tracks and reports different trade markets across the nation, approximately $2.1 billion in import/export products have traveled through RFD during the first three quarters 2021. This is all new business to RFD in the last 18 months; and

**WHEREAS,** fifteen different international airlines have begun service to and from RFD over the past six months (listed below) and are currently servicing the new International Cargo Center. Flights have grown in the last 18 months from eight monthly to over 100 monthly; and

**WHEREAS,** the construction of the new $50 million cargo expansion project – which is 65% complete:

- Has created hundreds of construction jobs
- Has generated 200 of the 600 permanent new jobs anticipated at the airport
- Continues to add to growth of the region's strength in worldwide international cargo operations; and

**WHEREAS,** the cargo expansion project includes:

- A recently completed 90,000-square-foot international cargo center (currently being used) designed to accommodate daily multiple aircraft landings and departures containing international import and export freight.
- An additional 100,000 square-foot international cargo facility, which is currently under construction and set to come online next spring.
- A new airplane ramp to accommodate six 747 aircraft.
- A new road that will extend off Cessna Drive to accommodate an anticipated thousands of tractor/trailer traffic monthly to and from the facility; and

**WHEREAS,** the land for the first phase of the new international cargo area ($50 million) **project** is solely owned by the Authority and designated for airport use for expansion of facilities and runways; and

**WHEREAS,** it is in the best interests of the Authority and the Rockford Region for the Authority to continue to be an economic engine for the Rockford Region; and

**WHEREAS,** it has been alleged that a Resolution was passed by the Board of Commissioners on November 1, 1977; and

**WHEREAS,** the area which the Resolution refers to is necessary for the operation of the Airport and the Midfield Air Cargo Expansion Project.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Commissioners of the Greater Rockford Airport Authority that the Resolution dated November 1, 1977, if it was ever approved by the Board of Commissioners, is hereby repealed and rescinded in its entirety and held for naught.

APPROVED by the Commissioners of the Authority this 16th day of December, 2021.

PAUL K. CICERO, Chairman

Attest:

TOM MYERS, Vice Chairman